**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 21-126** |
| **v.** | * | **SECTION: "S"** |
| **EMPIRE BULKERS LTD.** | * | |
| **JOANNA MARITIME LIMITED** | | |
| **WARLITO TAN** | * | |
| | * | |

<u>**WARLITO TAN'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO ALLOW
INSPECTION AND TESTING OF SEIZED EQUIPMENT**</u>

NOW COMES defendant Warlito Tan, by and through his counsel, and submits this memorandum of law in support of his motion to allow his expert, Antonis P. Panagiotareas, to inspect, test and evaluate the oil content meter the government took from the JOANNA on or about March 11, 2021.

FACTUAL BACKGROUND

During its March 11, 2021 inspection of M/V JOANNA the Coast Guard ordered defendant Tan to remove a guard from an oil content meter ("OCM") associated with the vessel's oily water separator ("OWS"), pollution control equipment certified by the MARPOL Administrator, the Republic of the Marshall Islands. Removing the guard revealed a small metal plate attached to an arm of the OCM's valve handle. The OCM's valve controls whether a sample of OWS discharge or fresh water intended to clean the sensor reaches a sensor within the oil content meter. The arm is designed to complete a connection with an electrical switch associated with a three-way-valve controlling whether OWS effluent can be discharged overboard or is instead returned to vessel tanks. If the valve handle is position to allow fresh

water to reach the OCM's sensor, the electrical switch closes the three-way valve to prevent discharge.

The Coast Guard and all parties have been interested in determining how the small metal plate affects operation of the OCM and how accurate the OCM is.  At least four effects of the metal plate during OWS operation are possible.  It could have no effect on OCM performance.  It could allow a diluted sample to reach the meter during operations.  It could allow pure fresh water to reach the meter.  It could prevent any liquid from reaching the sensor during operations.

Without a search warrant or other process, the government seized the OCM on March 11, even though it and the OWS had never been used (and could not lawfully be used) in the United States.

Over the following thirteen months, the government has conducted inspections and tests of the OCM's performance.  The government has never provided the defendants with advance notice of any of those tests, nor any opportunity to comment on the design of the tests or to observe any of them.

The limited information provided about the tests include short videos of small portions of some of the tests and a lawyer-prepared summary of the expected testimony of the government's retained expert, James Dolan, who apparently witnessed the tests.

The first set of tests involved testing the OCM to determine whether the government believed it accurately measured oil content.  The government's testing conducted without notice to the defendants (the owners of the equipment) involved testing, cleaning, and testing again.  Apparently, the government concluded that the OCM overstated the presence of oil.  The defendants have no way of duplicating those tests.

The second set of tests conducted without notice involved evaluating or estimating how the metal piece attached to the valve handle affects the flow of sample and clean water through the OCM.  Because the tests involved connecting the OCM's two input fittings to buckets containing dyed and clear water the tests are known as the "bucket tests."  The bucket tests, too, were conducted without notice to or an opportunity for observation by any defendant.  Based on its designation of the expected testimony of Mr. Dolan, it appears the government concluded that during operation the metal piece either caused or "may have" caused a combination of both OWS discharge sample and fresh water to reach and be evaluated by the OCM during high seas operations back in 2020 and early 2021.

It appears from photographs provided by the government that it conducted variations of the tests described in the designation for Mr. Dolan and conducted the tests for much longer than depicted in videos.  The videos of the bucket tests last just over one minute.  The results of variations apparently conducted as part of the bucket tests and of any more extended bucket testing are not disclosed in the designation for Mr. Dolan's testimony, or otherwise.

Based on videos provided after the fact, the government's tests have been criticized by, among others, certified technical professionals who are responsible for testing, installing and certifying this particular Deckma-manufactured OCM, including because the OCM was tested while in a horizontal position.  The manufacturer requires that it be installed, operated and tested vertically.

Defendant Tan respectfully asked the government and now asks the Court that Mr. Panagiotareas be allowed to duplicate the tests the government says it performed, additional tests the defense believes the government performed but the results of which were not disclosed, and whatever follow-up or prolonged testing might prove helpful in evaluating the OCM based on

the results obtained.  As the government was allowed to and did design and conduct its own tests without the defense having prior notice or an opportunity to observe the testing, defendant Tan respectfully asks that his expert be similarly allowed to conduct his inspection and testing of the OCM without interference or observation by the government.

Defendant's expert, Mr. Panagiotareas, was allowed to observe the OCM, but only in the presence of government officials and he was not allowed to conduct any tests.  As a result, he could not contemporaneously have confidential discussions concerning his observations with defense counsel.  The government rejected the defense's request that members of the defense team be allowed to inspect and discuss the OCM privately and confidentially and rejected the defense's request that it be allowed to conduct its own tests.

Defendant Tan's co-defendants conducted tests of what was believed to be an OCM identical to the OCM the government seized from the JOANNA.  Those tests concluded the metal plate had (and even a larger metal plate would have) no effect on the OCM's performance. Defendant Tan cannot afford to buy an OCM; he is particularly interested, in any event, in understanding and helping the jury understand the operation of the unit actually on the JOANNA.

Of course, Mr. Panagiotareas would not in any way modify the OCM or affect its future performance.

DISCUSSION

I.  *Rule 16 contemplates a reasonable opportunity for the defense to inspect and test the OCM*

Federal Rule of Criminal Procedure 16 (a)(1)(E) requires the government to provide access to objects if the item is "material to preparing the defense" *or* the government "intends to use the item in its case-in-chief at trial," or "the item was obtained from or belongs to the

defendant."  Here the government plainly intends to use the OCM at trial, close inspection of it is material to the defense preparation, and the item was seized from defendants in the case.

"Rule 16 is a discovery rule designed to protect defendants by compelling the prosecution to **turn over** to the defense evidence material to the charges at issue." *Yates v. United States*, 135 S. Ct. 1074, 1083, 191 L. Ed. 2d 64 (2015) (emphasis supplied); *see also United States v. Llanez-Garcia,* 735 F.3d 483, 486 (6th Cir. 2013) ("Among other things, Rule 16 enables a defendant to **obtain** . . . tangible objects in the government's possession, custody, or control, as long as the items are either material to preparing the defense or will be used in the government's case-in-chief at trial." (emphasis supplied; internal quotation marks omitted). In *United States v. Armstrong*, 517 U.S. 456, 462, 134 L. Ed. 2d 687, 116 S. Ct. 1480 (1996), the Court held that "material to the preparation of the defendant's defense" means "the defendant's response to the Government's case in chief . . ."

Many cases recognize that the right to inspect objects relevant to a case includes in appropriate cases an opportunity to test and inspect them scientifically.  For example, if a case involves narcotics, Rule 16 "includes the right to have an expert examine the narcotics before trial." *United States v. Sullivan,* 578 F.2d 121, 124 (5th Cir. 1978).   The Fifth Circuit recognizes that in appropriate cases "a concomitant part of the examination or inspection to be the right of the accused to have an independent chemical analysis performed on the seized substance." *United States v. Gaultney*, 606 F.2d 540, 545 (5th Cir. 1979); *see also United States v. Vaughn*, 736 F.2d 665, 666 (11th Cir. 1984) ("Defendants could have obtained their own analysis of the [cocaine] samples"); *United States v. Pollock,* 402 F. Supp. 1310, 1312 (D. Mass. 1975) (ordering government to supply defense counsel with sample of seized substance, noting that courts have "allowed both inspection and independent analysis of suspected narcotics upon a

showing that the proposed discovery was reasonable and might be material to the defendant's case").

The defense is often entitled to an equal opportunity to evaluate and duplicate tests that will be important at trial.  In *United States v. Gordon,* 580 F.2d 827, 836 (5th Cir. 1978), the government's expert produced methaqualone by using three of the chemicals and similar equipment seized from defendants but then destroyed the product. The Fifth Circuit declared that though the defendants were given samples of the raw materials to experiment on, "the product of Dr. Hanel's experiment was clearly discoverable under the specific terms of Rule 16(a)(1)(C) and that the material instead of being destroyed should have been submitted for inspection." *Id.* at 836-37 (footnote omitted).

In *United States v. Liquid Sugars, Inc.*, 158 F.R.D. 466 (E.D.Cal. 1994), defendants charged with violation of the Clean Water Act requested documents concerning the government's sampling, testing and underlying analysis of wastewater. The court noted that "it is not consonant with good trial preparation to await analyzing scientific foundational information, at times quite complex, until such time as the government expert is relating the foundation at trial for the first time." *Id*. at 470. Based on this observation, the *Liquid Sugars* court concluded that much of the underlying documentation was material for purposes of Rule 16(a)(1)(E), applying a materiality standard that requires a showing that the requested documents would be helpful to the defense.

> The government will be required to establish a foundation for the test results when it first puts its expert on the stand at trial. That foundation is the information which defendants now seek. Since the foundation is an essential element to the government's case-in-chief, it necessarily becomes "helpful to the defense."

*Id*. at 471-72. Relying upon Rule 16(a)(1)(E), the district court ordered production of "documents directly pertinent to the meaningful understanding of, or foundation for, the test results." *Id*. at 473. This included chain of custody documents, laboratory bench sheets, testing

procedures utilized, calibration standards utilized, and other methodologies employed for the

testing. Id. *Accord, United States v. Grace,* 223 F.R.D. 586, 589-90 (D. Mont. 2005). *See also*

*United States v. Robinson,* 272 Fed. Appx. 421 (6th Cir. 2007), *cert. den'd,* 556 U.S. 1185

(2009) (defendant could have petitioned for production of shirt for testing).

The best and fairest way to provide the defense with an opportunity to evaluate the

government's testing of the OCM over the last 16 months is to afford the defense a few weeks to

duplicate the tests it believes the government conducted and to conduct follow up tests suggested

by those results and to inspect the OCM without the government listening in on confidential

communications between the defendant, his attorney and his expert.

II.     *The Due Process clause requires that same reasonable opportunity*

The Supreme Court has recognized that even apart from Rule 16 due process requires fair

discovery, exchange of information and an opportunity to prepare and present the defendant's

case.  Thus, the Court explained, "there are situations in which evidence is obviously of such

substantial value to the defense that elementary fairness requires it to be disclosed even without a

specific request. For though the attorney for the sovereign must prosecute the accused with

earnestness and vigor, he must always be faithful to his client's overriding interest that 'justice

shall be done.' He is the 'servant of the law, the twofold aim of which is that guilt shall not

escape or innocence suffer.'" *United States v. Agurs,* 427 U.S. 97, 110-11, 96 S. Ct. 2392, 49 L.

Ed. 2d 342 (1976).

The landmark case requiring governmental disclosure of information of course is *Brady*

*v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  As this Court has explained,

"*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.'"

*United States v. Satary*, 2020 U.S. Dist. LEXIS 181982 (E.D. La., Oct. 1, 2020).

It is fundamentally unfair for the government to seize a piece of equipment from defendants, hold it for thirteen months while inspecting, testing, and altering it at the government's leisure and without prior notice to or observation by the defendants but then refuse to allow the defendants to conduct duplicate and follow-up tests on their own.   Moreover, the defense cannot reasonably meet or respond to the testing secretly performed by the government without observation without being afforded a similar opportunity to conduct its own tests and whatever follow up tests the results suggest.

The government acknowledges that it unilaterally altered the OCM, without notice to the defense.  Those alterations cannot be reversed.  The defense, however, does not propose to alter the OCM in any such manner.  It will be returned and available for trial in exactly its current condition.

CONCLUSION

Defendant Tan respectfully prays that this honorable Court will allow the defense to inspect and test the OCM over a reasonable period of two to three weeks.

Dated this ____ day of April 2022.

/s/ William Most
Caroline Gabriel, Bar No. 38224
William Most, Bar No. 36914
Most & Associates, L.L.C.
201 St. Charles Ave. Suite 114 #101
New Orleans, LA 70170
(504) 509-5023
caroline.gabriel.ma@gmail.com

/s/ Edward S. MacColl
Edward S. MacColl, MBRN #2658
Pro Hac Vice
Counsel for Defendant Tan

CERTIFICATE OF SERVICE

I do hereby certify that on the above date I attempted to make service of the above document by electronically filing the same using the Court's EM/ECF system.

__/s/ Edward S. MacColl_____