**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO:  21-126** |
| **EMPIRE BULKERS LTD., JOANNA MARITIME LIMITED, AND WARLITO TAN** | **SECTION: "S" (4)** |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that Warlito Tan's **Motion for Reconsideration of Rulings on Motion to Dismiss** (Rec. Doc. 229) is **DENIED**.

## BACKGROUND

Detailed facts of this case have been set forth in prior orders of this court, and thus are not restated here. See, e.g., Rec. Doc. 112. The present motion stems from this court's prior denial of the defense[1] motion to dismiss Counts One and Four of the Indictment. Id. Tan now moves the court to reconsider its denial of those two counts.

## LEGAL STANDARD

While motions for reconsideration in criminal actions "are nowhere explicitly authorized in the Federal Rules of Criminal Procedure, they are a recognized legitimate procedural device." United States v. Lewis, 921 F.2d 563, 564 (5th Cir. 1991) (citing United States v. Cook, 670 F.2d 46, 48 (5th Cir. 1982)). Courts apply the standards set forth in the Federal Rules of Civil

---

[1]The prior motion was urged by defendant Warlito Tan and two organizational co-defendants, Empire Bulkers,, Ltd. and Joanna Maritime Limited. The organizational defendants have since pleaded guilty, and thus the instant motion is brought solely by Tan.

Procedure to motions for reconsideration in the criminal context. U.S. v. Rollins, 607 F.3d 500, 502 (7th Cir. 2010) (citations omitted). The general practice in the United States District Court for the Eastern District of Louisiana has been to evaluate motions to reconsider interlocutory orders under the same standards that apply to motions to alter or amend final judgments made pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. See Johnson v. Inv. Equities, LLC, 2019 WL 2250254, at *1 (E.D. La. May 24, 2019) (collecting cases).

Relief under Rule 59(e) is appropriate: " '(1) where there has been an intervening change in the controlling law; (2) where the movant presents newly discovered evidence that was previously unavailable; or (3) to correct a manifest error of law or fact.' " Berezowsky v. Rendon Ojeda, 652 F. App'x 249, 251 (5th Cir. 2016) (quoting Demahy v. Schwarz Pharma, Inc., 702 F.3d 177, 182 (5th Cir. 2012)). In the instant case, defendant Tan argues that there has been an intervening change in controlling law justifying reconsideration of the court's prior denial of his motion to dismiss Counts One and Four of the Indictment.

## DISCUSSION

### *Does West Virginia v. Environmental Protection Agency require dismissal of Count One?*

Tan contends that the United States Supreme Court's decision in West Virginia v. EPA, 142 S. Ct. 2587 (2022), requires a finding that the regulation relied upon in Count One of the indictment is *ultra vires*. In West Virginia, the Supreme Court held that the Environmental Protection Agency does not have the authority under the Clean Air Act to regulate greenhouse gas emissions from existing power plants based on the generation shifting approach set forth by

the EPA in the Clean Power Plan. The holding was premised on the "major questions doctrine,"

which provides that for issues of major national significance, a regulatory agency must have

clear statutory authorization from Congress to take certain actions and cannot rely on its general

agency authority. Id. Tan argues that clear statutory authorization is lacking for the regulation as

applied upon which Count One is based, and thus the regulation is an *ultra vires* exercise of

power.

Count One charges Tan with a knowing violation of the Act to Prevent Pollution from

Ships ("APPS"), 33 U.S.C. § 1901 et seq.[2] while in U.S. waters. It charges:

> On or about March 11, 2021, at the Port of New Orleans, and within the
> Eastern District of Louisiana, and elsewhere [the Defendants] did knowingly fail
> and cause the failure to maintain an accurate ORB for the MV JOANNA, in
> which quantities of oil residue, oily mixtures, and machinery space bilge water,
> and the discharge and disposal of these substances, were fully and accurately
> recorded, as required. Specifically, during the period of on or about October 25,
> 2020, through on or about March 11, 2021, the Defendants [(1)] falsely recorded
> and caused to be falsely recorded that discharges of oily bilge water had been
> made through a properly functioning OWS and OCM when they had not, and (2)
> failed to record exceptional discharges of oily bilge water made without the use of
> a properly functioning OWS and OCM, in violation of Title 33, United States
> Code, Section 1908(a), Title 18, United States Code, Section 2(b), and Title 33,
> Code of Federal Regulations, Section 151.25.

Under the challenged regulation, all oceangoing ships exceeding 400 gross tons are

---

[2] The APPS was enacted by Congress to implement the 1973 International Convention
for the Prevention of Pollution from Ships, as amended in 1978. 1340 U.N.T.S. 184; 1340
U.N.T.S. 61. These treaties are collectively called "MARPOL," an abbreviation for maritime
pollution. "The APPS prohibits violations of MARPOL, the APPS, and the regulations
promulgated pursuant to [33 U.S.C.] § 1903(b)." United States v. Jho, 534 F.3d 398, 401 (5th
Cir. 2008).

required to maintain an Oil Record Book ("ORB"), kept "readily available for inspection at all reasonable times." 33 C.F.R. §§ 151.25(a), (I). "Disposal of oil residue" or "[d]ischarge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces" are required to be recorded in the Oil Record Book. 33 C.F.R. §§ 151.25(d)(3)-(4). "The master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record." 33 C.F.R. § 151.25(j). The APPS and its regulations apply to foreign-flagged vessels only when they are "in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States." 33 C.F.R. § 151.09(a)(5); see also 33 U.S.C. § 1902(a)(2).

Tan complains that as interpreted, this regulation requires the ORB accurately to document all handling of bilge waste outside the United States. Thus, Tan renews his argument made in his first motion to dismiss Count One, that it polices high seas conduct and record-keeping, exceeding the authority granted by Congress in the APPS, which was limited to activities within the United States. Tan further contends that this radically shifts the enforcement mechanism for improper record-keeping on the high seas from the flag state to the port state, with far-reaching consequences that implicate the major questions doctrine.

The court has previously determined that this regulation does not police activity on the high seas. See, United States v. Empire Bulkers Ltd., No. CR 21-126, 2022 WL 326643, at *4 (E.D. La. Feb. 3, 2022) (citing United States v. Jho, 534 F.3d 398, 404 (5th Cir. 2008); United States v. Vastardis, 19 F.4th 573, 583 (3rd Cir. 2021)). The offense of failing to maintain an

accurate ORB takes place when a knowingly inaccurate ORB is presented in a U.S. port. It therefore occurs in the United States, not on the high seas, and is properly prosecuted in the United States. The inaccuracies themselves may be comprised of references to illegal polluting events that occurred on the high seas, and under the APPS and MARPOL, they may be referred to the flag country of the ship for investigation or prosecution. But those high seas polluting events are separate and distinct from the ORB regulation violation. Because the regulation at issue does not regulate high seas activities, it does not result in a shift of the enforcement regime of APPS or MARPOL. Therefore, there is no major enforcement shift that could be considered a "major question", and West Virginia is not applicable to the instant case.

### *Does Jarkesy v. Securities and Exchange Commission require dismissal of Count One?*

In Jarkesy v. Securities and Exhcnage Commission, 34 F.4th 446 (5th Cir. 2022), a divided panel of the Fifth Circuit Court of Appeals applied the non-delegation doctrine to strike down a provision of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-2(a), granting the SEC the authority to choose whether to bring certain enforcement actions in Article III courts or in administrative proceedings. See Jarkesy, 34 F.4th at 459–63. The Fifth Circuit found that "Congress has delegated to the SEC what would be legislative power absent a guiding intelligible principle." Jarkesy v. Sec. & Exch. Comm'n, 34 F.4th 446, 461 (5th Cir. 2022). In fact, it found that the delegation had been made with "*no guidance* whatsoever." Id. at 462 (emphasis in original).

As he argued in connection with Count One, Tan contends that as enforced, the APPS

regulations related to ORBs permit worldwide U.S. enforcement of the MARPOL convention,

and as such they are too open-ended, and thus run afoul of the holding in Jarkesy. Tan does not

address the fact that in Jarkesy, the problem identified was not just the open-endedness of the

provision, but the lack of guidance as to how it should be applied.

Unlike the rule examined in Jarkesy, it cannot be said that the APPS lacks an intelligbile

principle, or provides no guidance. To the contrary, the APPS references the policy aims,

structure, and content of MARPOL, and provides detailed guidance on the duties of the

Secretary of the department in which the Coast Guard is operating. See 33 U.S.C. § 1903 et seq.

This alone makes Jarkesy inapplicable. Beyond that, the court has previously determined that the

regulations do not take aim at conduct outside of the United States. See Rec. Doc. 112. Thus,

they are not "open-ended" in the manner claimed by Tan. Accordingly, Jarkesy provides no basis

for dismissal of Count One of the indictment.

### *Does West Virginia v. Environmental Protection Agency require dismissal of Count Four?*

Tan also contends that West Virginia dictates the dismissal of Count Four. Count Four

charges the defendants with knowingly violating the Ports and Waterways Safety Act of 1972

("PWSA"), 46 U.S.C. §70001 et seq., by failing to notify the U.S. Coast Guard of a hazardous

condition on board the JOANNA when the vessel was located within the United States. The

applicable regulation provides:

> Whenever there is a hazardous condition either on board a vessel or caused by a
> vessel or its operation, the owner, agent, master, operator, or person in charge
> must immediately notify the nearest Coast Guard Sector Office or Group Office,

6

and in addition submit any report required by 46 CFR 4.05-10.

33 CFR § 160.216(a). "Hazardous condition" is defined as "any condition that may adversely

affect the safety of any vessel, bridge, structure, or shore area or the environmental quality of

any port, harbor, or navigable waterway of the United States. It may, but need not, involve

collision, allision, fire, explosion, grounding, leaking, damage, injury or illness of a person

aboard, or manning-shortage." Id., § 160.202. The regulation applies to all commercial vessels

and to all foreign vessels "that are bound for or departing from ports or places within the

navigable waters of the United States ...." Id., §160.203.

Again relying on West Virginia, Tan argues that the requirement in 33 C.F.R. § 160.216,

that the Coast Guard be notified of hazardous conditions, is an *ultra vires* assertion of

regulatory authority. Tan contends that because the regulation is not limited to hazards to

navigation or to the marine environment in U.S. waters, which is the subject of the PWSA, but

encompasses vessel safety generally, it differs in scope and kind from the enabling legislation it.

Therefore, Tan argues that under West Virginia, there must be clear congressional

authorization, which he contends is lacking, making the regulation *ultra vires*. He especially

takes issue with defining hazardous conditions to include "injury or illness of a person aboard,

or manning-shortage," arguing that it effectively creates a "naval OSHA" not intended by

Congress in enacting the PWSA.

The PWSA instructs that "the Secretary shall issue... regulations necessary to implement

subchapters I through III and this subchapter." 46 U.S.C. § 70034(a). Further, the "Secretary

7

may investigate any . . . act . . . that affects or may affect the safety or environmental quality of

the ports, harbors, or navigable waters of the United States." 46 U.S.C. § 70035(a). Subchapter

II provides in part:

> The Secretary may take such action as is necessary to–
>
> (1) prevent damage to, or the destruction of, any bridge or other structure on or in the navigable waters of the United States, or any land structure or shore area immediately adjacent to such waters; and
>
> (2) protect the navigable waters and the resources therein from harm resulting from vessel or structure damage, destruction, or loss.

46 U.S.C. § 70011(a). Specific actions authorized to achieve this goal include "establishing

procedures for examination to assure compliance with the requirements prescribed under this

section." 46 U.S.C. § 70011(b)(4). Further, the original PWSA policy statement provided that

one goal of agency supervision was to "insure that vessels operating in the navigable waters of

the United States shall comply with all applicable standards and requirements for vessel

construction, equipment, *manning*, and operational procedures . . . 33 U.S.C. § 1221(c)(3)

(repealed 2018) (emphasis added).[3]

Thus, the enabling legislation and policy statement authorize the agency to establish

examination procedures to assure compliance with the PWSA, the objectives of which are to

---

[3] The provisions of the PWSA were re-codified in Title 46 in 2018. PL 11-282, Dec. 4, 2018, 132 Stat 4192. The original Statement of Policy setting forth the purposes of the enactment, codified at 33 U.S.C. § 1221, was not retained. It is available at: https://uscode.house.gov/view.xhtml?req+granuleid:USC-2000-title33-section1221 & num=0 & edition=2000#miscellaneous-note.

prevent damage to the ports and waterways of the United States, and to protect the navigable

waters from harm resulting from vessel or structure damage. In enacting the legislation,

Congress clearly recognized that adequate manning of vessels was essential to this goal. As the

court previously opined, requiring hazards on vessels that could affect safety to be reported upon

arrival in port is an obvious and reasonable means to achieve the legislative directive. It does not

exceed Congress's clear grant of authority to the agency, but rather comports with the central

mandate of the PWSA, and thus, is not an *ultra vires* exercise of regulatory power. Nothing in

West Virgina requires a different result.

### *Does Jarkesy v. Securities and Exchange Commission require dismissal of Count Four?*

Title 46, section 70034 of the PWSA provides in part: "the Secretary shall issue, and may

from time to time amend or repeal, regulations necessary to implement subchapters I through III

and this subchapter." 46 U.S.C.A. § 70034(a). Tan reiterates his prior argument that to the extent

section 70034 of the PWSA authorizes regulation of *anything* impinging on safety, it grants too

much legislative leeway to the Coast Guard to regulate and thus violates non-delegation

principles. He seeks reconsideration arguing that in Jarkesy the Fifth Circuit imposed a more

rigorous limit on such open-ended delegations.

Tan previously argued that the non-delegation rule was violated because there was no

intelligible principle informing the PWSA. He now argues that the intelligible principle

identified in the court's prior opinion, to prevent damage to the ports and waterways of the

United States, and to protect the navigable waters from harm resulting from vessel or structure

damage, does not encompass internal safety concerns, and that a regulation reaching them is
unauthorized.

This argument is premised on the faulty assumption that failure to maintain adequate
internal safety standards cannot cause damage to the ports and waterways of the United States, or
cause harm to navigable waters from vessel or structure damage. The single example of the M/V
BRIGHT FIELD allision, which caused extensive damage in the Port of New Orleans, was
attributed to a failure to adhere to rudimentary operating procedures including seemingly trivial
items such as poorly maintained oil filters.[4] It simply does not follow, as Tan argues, that if the
regulation reaches internal safety concerns, then it is not designed to prevent damage to the ports
and waterways of the United states, and to protect the navigable waters from harm resulting from
vessel or structure damage. To the contrary, internal safety on vessels is often critical to
achieving these aims.  Accordingly, the fact that such internal safety concerns are encompassed
in the regulations does not make the delegation limitless or lacking a sufficiently intelligible
principle.

Finally, notwithstanding the divided opinion in Jarkesy, the fact remains that the
Supreme Court has "almost never felt qualified to second-guess Congress regarding the
permissible degree of policy judgment that can be left to those executing or applying the law,"

---

[4] See, NTSB Marine Accident Report Allision of the Liberian Freighter Bright Field with
the Poydras Street Wharf, Riverwalk Marketplace, and New Orleans Hilton Hotel in New
Orleans, Louisiana December 14, 1996, https://www.ntsb.gov › Reports › MAR9801.

and thus has not found an impermissible delegation since 1935. Whitman v. Am. Trucking

Associations, 531 U.S. 457, 474–75 (2001) (internal quotations omitted).

For all of the foregoing reasons, the court finds that the recent holdings in West Virginia

v. EPA, 2022 WL 2347278 (June 30, 2022), and Jarkesy v. Securities and Exhcnage

Commission, 34 F.4th 446 (5th Cir. 2022), do not require a different result from the court's

previous ruling. Accordingly,

**IT IS HEREBY ORDERED** that Warlito Tan's **Motion for Reconsideration of**

**Rulings on Motion to Dismiss** (Rec. Doc. 229) is **DENIED**.

New Orleans, Louisiana, this   24th   day of August, 2022.


**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

11