

# Chalos & Co. P.C.
International Law Firm

55 Hamilton Avenue, Oyster Bay, New York 11771
TEL: +1-516-714-4300   FAX: +1-516-750-9051   WEB: www.chaloslaw.com   EMAIL: info@chaloslaw.com

April 18, 2022

**Via E-Mail and FedEx**

Richard A. Udell
Kenneth E. Nelson
U.S. Department of Justice
Environmental Crimes Section
150 M St., N.E./ Room 4.206
Washington, DC 20530
Phone: (202)305-0361
E-mail: Richard.Udell@usdoj.gov
　　　　Kenneth.Nelson3@usdoj.gov

G. Dall Kammer
United States Attorney's Office
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA 70130
Phone: (504) 680-3000
E-mail: Dall.Kammer@usdoj.gov

**GOVERNMENT EXHIBIT A**

**Re:**   *United States v. Warlito Tan., et al.*, No. 2:21-cr-000126-MVL-KWR
　　　　**Eastern District of Louisiana**
　　　　**Designation of Expert Testimony of Antonis P. Panagiotareas**

Dear Counsel:

Pursuant to Federal Rule of Criminal Procure 16(b)(1)(C), defendants Empire Bulkers Ltd. and Joanna Maritime Limited provide the following written summary of testimony they may offer at trial from Antonis P. Panagiotareas pursuant to Federal Rules of Evidence 702, 703, and 705.

**I.　　Qualifications**

Mr. Panagiotareas' qualifications are set forth in greater detail in the attached CV. Exhibit 1. Summarizing the highlights, he holds degrees from Texas A&M University in Maritime Systems Engineering (Hydrodynamics) and a Master of Business Administration from the University of Leicester. He sailed as a Third Engineer and served as a Petty Officer 3rd Class in the Hellenic Navy. Mr. Panagiotareas has over

Case 2:21-cr-00126-MVL-KWR   Document 256-2   Filed 10/19/22   Page 2 of 12



CHALOS & CO. P.C.
International Law Firm

twenty-five years' experience working in-house for vessel Owners, Operators, and technical managers. Mr. Panagiotareas is the principal of Oceanus Maritime Services LLC, based in Houston, Texas.

Mr. Panagiotareas provides marine engineering, offshore engineering, and ship management consultancy services to various clients, including but not limited to, P&I Clubs, insurance companies, shipping companies, and members of the maritime and engineering community. His engineering and consultancy experience includes environmental compliance and awareness, investigation of seaworthiness, pollution incidents, and vessel performance disputes, among others. Under Mr. Panagiotareas' guidance and leadership, Oceanus Maritime Services, LLC holds a valid Document of Compliance and an approved Safety Management System. As an auditor, he has conducted numerous appraisals and audits of shipping companies and offshore assets, evaluated failing management and safety management systems, and then offered workable, practical solutions.

II.     Anticipated Testimony

Mr. Panagiotareas may provide fact and expert testimony regarding the M/V JOANNA's engine room piping, tanks, systems, design, and functionality, including with respect to its pollution control and fuel systems. He may testify concerning the design and functionality of the pollution prevention equipment. Depending on whether government witnesses are permitted to testify concerning the requirements of MARPOL, APPS, the U.S. Code of Federal Regulations, and the laws of foreign countries, he may provide testimony concerning those topics. He may also opine that the systems and procedures in place onboard the vessel provided a system of routine maintenance of the vessel's oily water separator ("OWS") and that the crew complied with those procedures and requirements. He may testify that those systems would not require and in fact do not contemplate the vessel's chief engineer inspecting internal workings of the oil content meter ("OCM") associated with the OWS and that, to the contrary, it would be inconsistent with common practices for a chief engineer to remove guards or inspect the internal workings of an OWS's OCM. Mr. Panagiotareas may provide fact and expert testimony concerning the types of maintenance and repairs typically and regularly required onboard large ocean-going vessels, such as the JOANNA, ==the likelihood that crews would detect hidden alterations in equipment that were not required or expected to be inspected by the crew and that appear to be operating correctly. He will explain that it is particularly unlikely a chief engineer or crew would detect a hidden modification in an OWS's OCM under all the circumstances known to have existed with respect to the JOANNA.==



### CHALOS & CO. P.C.
International Law Firm

Mr. Panagiotareas may provide testimony concerning the nature, scope, number and variety of machinery and equipment onboard the JOANNA and similar vessels, the procedures typically employed to identify, address and repair problems and malfunctions with such equipment. He is expected to explain that the alteration of the valve handle on the JOANNA's OCM was a carefully-designed and installed, hidden modification that appeared designed to and that was likely to avoid detection or observation, including by chief engineers. He is expected to testify that the alteration had been in place continuously over many years and that it apparently went undetected and unobserved during a variety of port state and other inspections.

Mr. Panagiotareas is expected to testify that the government prohibited him from taking control of or design tests concerning the functionality of the OCM, but that if: 1) the USCG ordered and conducted tests to demonstrate that a diluted sample of OWS effluent was frequently or usually tested by the OCM as containing 3 to 4 parts per million of oil; and 2) if the government's tests demonstrate that the OCM was reliable except that, due to a dirty lens, it overstated oil content; and 3) that, as a result, (as the government has asserted), the allegedly diluted samples contained no parts per million of oil; then it necessarily follows that the undiluted sample also contained no or virtually no oil. He may testify that the OWS in fact effectively separated oil from water. His conclusion in that regard may be based on the limited available evidence of the government-monitored operation of the OWS after a replacement OCM was installed.

Mr. Panagiotareas is expected to testify that it is a common practice in the maritime industry in the United States and elsewhere for parties who are engaged or likely to become engaged in litigation to coordinate concerning potential testing of systems under investigation. Such coordination typically takes the form of what are called joint surveys. He is expected to testify that such joint or coordinated investigations are important and reliable because both sides are able to suggest modifications or follow-up inspections or tests. He is expected to testify that in this case the government appeared to seize and control all evidence, to design and conduct its own tests, and to control which tests and results were shared with the defense. He is expected to testify that the government's practice of so secretly designing, conducting, and controlling information about tests reduces the reliability of the testing.

Mr. Panagiotareas is expected to testify concerning the types of fuel oil employed on the JOANNA and on similar vessels and on the vessel's systems for storing, preparing, and burning those fuel oils and concerning the circumstances under which different fuels are used. He is expected to testify concerning the design, function, and use of the vessel's fuel preheaters. He is expected to testify that the vessel would not be expected to use, did not use, and could not lawfully use heavy fuel oils – or bunkers – anywhere near the waters or shore of the United States (or many other countries).



CHALOS & CO. P.C.
International Law Firm

He is expected to explain that instead the vessel used diesel fuel in those areas, that diesel fuel passed through the vessel's fuel pre-heaters, but that no heat or steam would be expected to or was employed in any way to preheat the diesel fuel. He is expected to testify that, instead, the preheaters were turned off. He is expected to testify that the preheater's pressure relief valves are designed and intended to protect against over-pressurization of heavy, bunker fuels that are pre-heated using steam and pressure including to reduce viscosity, but that because pre-heaters are not used with diesel fuels or other fuels allowed within the United States the pressure relief valves do not serve an important safety function while in a U.S. port. He is expected to testify that the condition of the pressure relief valves did not pose an unreasonable safety hazard while inside the United States. He is also expected to testify that the crew's response to the leak associated with the pressure relief valve was reasonable and that the decisions of the engine crew and the USCG not immediately to notify the captain or the pilot of the leak and the alternations made in response to it were reasonable given all the circumstances. He is expected to testify that vessel maneuvers are an important operation that require the attention and coordination of the vessel's deck crew, engine crew and pilot, and that it would not have been reasonable or prudent to divert further the attention of those groups with the modest issue associated with the reasonably controlled leak in preheaters that were neither preheating fuel nor creating a significant risk.

Mr. Panagiotareas may provide testimony on the functionality of the Engine Room as a whole and that review of the records, logs, forms, and communications to and from the JOANNA indicate that the pollution prevention equipment, including but not limited to the OWS and OCM were believed to be working in good order and condition. He is expected to testify that equipment had been repeatedly inspected by government and other officials and found to be in good condition at times when it almost certainly was in the same condition it was in upon arrival in the Port of New Orleans. He may testify that port states were duty-bound to honor the certification of the equipment by the Republic of the Marshall Island, which is the Administration for purposes of MARPOL.

Mr. Panagiotareas may also provide testimony that it was his opinion that the Oil Record Book entries and the historic OCM readings and vessel alarm history were all objectively consistent with a vessel of this size and type being well-maintained and properly operated.

After he is afforded a reasonable opportunity to inspect video recordings and photographs of the alterations the USCG and its consultants have made to the OCM taken from the JOANNA, Mr. Panagiotareas may opine concerning whether he believes the OCM overstated the content of oil in samples presented to it as the government appears to assert.



CHALOS & CO. P.C.
International Law Firm

Mr. Panagiotareas may provide additional testimony and opinion that the bilge water being produced and processed by the vessel as documented in the vessel's oil record book were objectively consistent with a vessel of this size, age, type, and involved in this type of trade. Mr. Panagiotareas may provide testimony that it is industry practice for chief engineers to rely on certifications from flag states and technicians that OCMs are calibrated and working correctly, especially where, as occurred here, the routine and prescribed testing of the OCM is carried out successfully and the unit is repeatedly inspected and certified by or on behalf of the MARPOL Administrator.

He may testify that opinions offered by government experts are not scientific or based on appropriate or sufficient testing or inspections, depending on what conclusions and opinions are offered. As summarized above, he may testify that the government's practice in this case of taking exclusive control of pollution control equipment certified by the MARPOL Administrator and designing and conducting unilateral tests of that equipment without prior notice to expected (or actual) litigation adversaries and without notice to the MARPOL Administrator is inconsistent with sound marine engineering practices and custom and with the provisions of MARPOL.

Finally, Mr. Panagiotareas may provide testimony on the functionality of the Engine Room as a whole and the review of the records, logs, forms, and communications to and from the vessel indicated that the pollution prevention equipment, including but not limited to the OWS and OCM were reported to be in good order and condition. He may also provide testimony that it was his opinion that the Oil Record Book entries and the historic OCM readings and vessel alarm history were all objectively consistent with a vessel of this size and type being well-maintained and properly operated. Mr. Panagiotareas is anticipated to provide additional testimony and opinion that the bilge water being produced and processed by the vessel were objectively consistent with a vessel of this size, age, type, and involved in this type of trade. Mr. Panagiotareas may provide testimony that it is industry practice for Owners and Managers to rely on the reports from the vessel through, among other things the PMS and communications via telephone and email from the Vessel's Master and Chief Engineer to ensure that the equipment was in good working order and that the onboard procedures were being complied with. Moreover, it is anticipated that Mr. Panagiotareas may testify that based on the policies and procedures in place, as well as the third-party inspections and audits which occurred onboard, that the records reflect compliance with all environmental protection policies onboard the vessel and the requirements of the SMS.



CHALOS & CO. P.C.
International Law Firm

### III. Bases for Opinions

The bases and reasons of Mr. Panagiotareas' opinions are expected to be his background, experience, and training as a licensed vessel engineer and vessel surveyor; his experience working for Owners, Operators, and Technical Managers; his review of various records from the M/V JOANNA, including tank sounding logs, vessel diagrams and office vessel records; data obtained from the OCM for the OWS; the ORB; various manuals and piping diagrams; the Port State Control Forms issued by the Coast Guard; inspection reports issued by other officials; his inspection of the vessel; his interviews with and interaction with crewmembers; the Rule 15 deposition transcripts of the crewmembers; reports of interviews of the vessel crewmembers conducted by the Coast Guard; the Environmental Management System for the vessel; the ISM Safety Management System for the vessel; crew EMS familiarization and training records; IOPP certificates for the vessel; photographs; the vessel's planned maintenance system; external audits; and internal audits and inspection reports; and documents exchanged in discovery in this matter.

The defense has requested an opportunity for Mr. Panagiotareas to inspect the OCM and any other equipment the government took from the JOANNA outside the presence of the government as well as an opportunity for Mr. Panagiotareas to design and conduct tests of his own. To date, the government has refused to allow such testing or private inspection. If such additional inspection or testing are allowed, the defense may, of course, supplement this designation.

The above notice of expert testimony provides notice of the matters which the defense intends its expert witness to testify about. We believe the above provides more than adequate notice pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure and Rules 702, 703, and 705 of the Federal Rules of Evidence. Defendants reserve the right to revise and to supplement its disclosure of expert and summary testimony in the above-entitled matter as this case proceeds to trial. Defendants respectfully reserve the right to supplement and/or amend this notice if necessary.

                      Sincerely yours,
                      Chalos & Co, P. C.

                      George M. Chalos, Esq.
                      Briton P. Sparkman, Esq.



# CURRICULUM VITAE

**Antonis P. Panagiotareas**

### Education:

B.Sc. Maritime Systems Engineering (Hydrodynamics), Texas A & M University (1986)
MBA (Maritime Administration), University of Leicester (2003)

### Professional Training:

- Shipboard Fire Emergency Procedures, Miami Dade Community College, 25 Nov 1990
- ISM Auditor/Lead Auditor Training for ISM, by Stebbing & Partners, 4 July 1996
- Certificate in Shipping, London Institute of Shipping & Transport, January 1997
- Oil Tanker Hull Inspection Course, by DnV, 30 October 1997
- ISPS Course, by DnV, 22 January 2004
- ISO 14000:1996 Internal Auditor Training Course, by Bureau Veritas, 14 November 2004
- Marpol Annex II and the Chemical Code Seminar, by Lloyds Register, 10 March 2005

### Work Experience

April 2016- Present

Owner of Oceanus Maritime Services LLC, a company based in Houston, Texas providing marine engineering, offshore engineering and ship management services.

The company provides an array of engineering services, including ship inspections and surveys. We assist vessels with their USCG PSC or COC inspections, we also conduct ISM/ISPS/MLC/Bridge Audits and internal audits as per client's needs.

We attend ships during vetting inspections and CDI inspections.

We conduct numerous pre-purchase inspections.

We conduct bunker surveys, on-hire/off-hire surveys, draft surveys and cargo surveys either on behalf of the owners or the P&I Clubs.



We are involved as H&M surveyors conducting post casualty attendances.  We also conduct P&I Condition surveys.

We are technical experts for maritime lawyers when required for Arbitration proceedings or legal cases and we have participated in numerous cases.

We consult clients when ordering newbuildings in reviewing specifications and maker's list.  We can provide plan approval services and site supervision.

We have a valid Document of Compliance and an approved Safety Management System which allows us to provide ship management services to our clients.

We provide agency services, acting as protective agents in Houston and the surrounding ports.

We provide consulting services in Cyprus and Greece in the offshore sector.  We have conducted training seminars for governmental employees in Cyprus and the safety inspection of the Prinos platform in Kavala, north Greece on behalf of Hellenic Hydrocarbons Resources Management S.A. the legislative and commercial arm of the Greek Government for the offshore sector.

November 2007 – April 2016: Free Bulkers S.A.

Initially employed as the Technical Director of the company, responsible for all day-to-day technical operation of the fleet. Promoted to General Manager in June 2014, given the overall responsibility of the operational management of the Company.

 The company was NASDAQ listed and operates 10 Handy, Handymax and Supramax bulk carriers.  In the first 5 years was also the DPA and CSO.

Reporting to the CEO of the Company, the job involves dealing with H&M and P&I claims, the supervision and monitoring of the Operations, Technical, Purchasing, QA and Crew Departments. This included the management of the office and fleet personnel, technical operation of vessels, repairs and dry docks (all the fleet was drydocked twice or 3 times during this period), preparation of budgets, monitoring of expenditures, assisting the finance department in the quarterly audits, internal and external audits and set up the Company Operating Procedures for the Gulf of Aden transits. (We did over 50 transits in 2011).



On our newbuilding project was responsible for the preparation of the specification, makers list, organizing a site team, and overall supervision.

Involved in the construction of 2 Handymax bulk carriers at Yangzijiang Shipyard. Specification was altered to include full compliance to the new BC Code, installation of a hold's cleaning system (similar to a COW system), and compliance with low sulphur operations.

In addition, we undertook the complete refurbishment of the company yacht, a 1921 built schooner, which was completely dismantled and re-built.  The project lasted 2 years with a budget of € 2,000,000 and included new interiors, galley, bathrooms, new engine, propeller, machinery, wiring, electrical equipment and new navigation/communication equipment.

Other responsibilities included the monitoring of the S&P activities of the company, arranging pre-purchase inspections, involved in the selection process of the candidates and arranged the deliveries and smooth entry into the fleet.

July 2004 – November 2007: Unibros Shipping, Piraeus, Greece

Employed as the Technical Manager, DPA and CSO of the company.

 The company operates 7 product and chemical tankers.

Was responsible for the technical department and the company's newbuilding program. We built 3 x 13,000 DWT IMO II tankers in KYHI, Korea. On all newbuilding projects was responsible for the preparation of the specification, makers list, organizing a site team, and overall supervision.

 The company has been vetted in the office by Shell and ChevronTexaco, has ISO 9001, ISO 14001 certification and preparing for the ISO 18001 certification.  We have submitted our TMSA to OCIMF.  Was part of the team that prepared all of the above.

The technical department responsibilities also include the department's budget, preparation and execution of Special and Intermediate surveys (a total of 10 drydocks during this period), Classification matters, ship personnel assignments, attendances by superintendents, S&P activities of the company, including pre-purchase inspections, and bunkers/lubricants management.  We also ensured that vessels complied with specific requirements of Shell who had a number of vessels under time charter.

Tel.: (281) 339 7952, Fax: (832) 864 2316, Mobile: +1(512) 994 9532

E-mail: info@oceansms.com, www.oceansms.com



As DPA and CSO was responsible for the implementation of the ISM and ISPS Codes throughout the organization.  We regularly review and improve our TQMS (Tanker Quality Management System), hold Management Reviews, training campaigns onboard the fleet, ship/shore exercises, improve our security plans, update the VPQ's and SMPEP's.

The roles are multitasked.

February 2002 – July 2004: Marine Management Services MC, Piraeus, Greece

Company operated Aframax and Panamax tankers. Was responsible for selection and implementation of a Planned Maintenance System across the fleet.  We chose the Consultas software from Norway, had the system approved by DNV and implemented across the fleet.

Responsible for the implementation of the ISPS Code. Got trained by DNV and obtained the CSO certification implemented the ISPS code across the fleet and carried out the initial audit by Flag and USCG.

Attended vessel's repairs and drydocks. A total of two ships were attended to for repairs at this time.

January 2000 – December 2001: Marmaras Navigation Ltd, Piraeus, Greece

Employed as Superintendent Engineer. The company expanded into tankers and was assigned to the technical operations of the tanker fleet.  The company acquired 3 Aframax tankers that where managed by Wallem Shipmanagement in Hong Kong.  In cooperation with my Wallem colleagues we monitored the vessels and passed their first Special or Intermediate surveys and drydocks in Europe and the Far East.

Was also involved in H&M claims, stevedore damage claims as the in-house technical expert, working with the company's Legal and Insurance Departments.

Tel.: (281) 339 7952, Fax: (832) 864 2316, Mobile: +1(512) 994 9532

E-mail: info@oceanusms.com, www.oceanusms.com



October 1995 – December 2000: Navitankers Management, Kifisia, Greece

Was employed as a Superintendent Engineer and two years later was promoted to Assistant Technical Manager.  Company operated 17 tankers, which included one Suezmax and remaining vessels where product tankers from 27,000 to 45,000 DWT. Assisting the Technical Manager in the technical management of the fleet which included budgeting, preparation and implementation of drydocking's (we drydocked each vessel of the fleet at least two times during this period) , Classification matters and personnel matters.  The company endeavored to construct new tonnage and was involved in the discussions to select a shipyard and then finalize the specification.  The company seized operations in the first months of 2001.

October 1993 – October 1995: Dynacom Tankers Management, Glyfada, Greece

Worked in the capacity of Superintendent Engineer.  During my tenure at Dynacom attended 17 purchases of vessels and 4 drydocking's of tankers in Europe and the Far East.  Was responsible for a fleet of 4 tankers, which included one VLCC, one Suezmax tanker and two Aframaxes.

April 1992 – October 1993: Silver Carriers SA, Piraeus, Greece

Employed as Assistant Superintendent Engineer.  Worked mainly in the office and was responsible for the administrative functions of the technical department, which included lubricants consumption monitoring, purchasing and lube analysis, monitoring of Class certificates and planning surveys, spare parts, review of vessels correspondence, planning of drydocking's and preparation of specifications, bunker analysis and budgeting.

Jan 1987 – March 1992: Dolphin Cruise Lines, Miami, Florida

Sailed for one year as apprentice engineer, followed by two contracts as 3rd engineer.  Upon completion of the third contract spent about 2 years at Turku, Finland, at Kvaerner Masa Yards, for the construction of the cruise vessel Royal Majesty, now the Luis Majesty.  In the period between January 1988 and January 1990 I completed my compulsory military service in the Hellenic Navy, as a Petty Officer 3rd Class, at the Naval Dockyards in Salamis Naval Base.



**Professional Societies:**

Member of ASME

Member of SNAME

Member of the Nautical Institute

Member of IMarEST

Member of the Industry Advisory Board for the Department of Marine Engineers at Texas A&M University at Galveston (the Texas Maritime Academy)