UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 21-126 |
| v. | * | SECTION: "S" |
| EMPIRE BULKERS LTD. | * | |
| JOANNA MARITIME LIMITED | | |
| WARLITO TAN | * | |
| | * | |

### WARLITO TAN'S RESPONSE IN OPPOSITION TO THE GOVERNMENT'S SECOND MOTION TO EXCLUDE EXPERT WITNESS TESTIMONY

NOW COMES defendant Warlito Tan, the former Chief Engineer of the foreign-flagged M/V JOANNA and a resident and citizen of the Republic of the Philippines, and respectfully responds to the government's second motion to exclude expert witness testimony (Document 256). The government's motion should be denied because the designated expert testimony is important and appropriate rebuttal to the government's designated expert testimony, has been more than adequately designated, and constitutes important and helpful expert testimony in understanding that Chief Tan, as he is returning to America to explain, is innocent of any wrongdoing, criminal or otherwise.

#### INTRODUCTION

The designated testimony relates to the effect of a metal insert or chock welded to a valve handle and hidden behind a guard on the oil content meter of the JOANNA. Chief Tan does not dispute that the insert is a modification that should not be made without the approval of the JOANNA's flag state, the Republic of the Marshall Islands. As he has told the Coast Guard, he

was not aware of its presence, does not know how it affects the operation of the OCM, and believes all entries he made in the ship's oil record book are accurate.

## FACTUAL AND LEGAL BACKGROUND

Although the Government asserts at page 3 of the pending motion that Chief Tan made "affirmative [ORB] entries asserting that discharges had been made through a properly functioning OCM," the ORB contains no evaluation, assertion, or certification by Chief Tan of the OCM's performance. Contrary to the Government's assertions, Marshall Islands law, consistent with MARPOL, prescribes the process by which OCMs are tested and certified. Vessel crews engage in only very limited testing (and the JOANNA's crew performed the required and authorized tests). Under Marshall Islands law implementing MARPOL, more detailed testing and certification is regularly required by certified professionals not associated with the ship's crew. As the trial evidence will show, the condition of the metal chock or insert and its weld make clear that the chock had been present for years, was never removed and rewelded (as the government mistakenly speculates and suggests its expert will opine), was present during several of those independent inspections and certifications, but was missed by the certified, professional inspectors, just as it was neither observed by nor known to Chief Tan.

The government seized the OCM on March 11, 2021. It engaged in extensive testing of the OCM during the next thirteen months, always without providing the defense an opportunity to observe or participate in the testing.

On April 4, 2022, the government designated proposed expert James Dolan. No report, summary or other document prepared by Mr. Dolan has been provided. Among other topics, Mr. Dolan was designated to testify that employees of MacKay Marine determined that because of a dirty lens the OCM's optical sensor at least sometimes overstated the presence of oil, that they

cleaned the lens, that the cleaned censor correctly measured "0" oil in pure water, and that relative "flat-line" readings of oil content are "consistent" with the metal chock causing pure fresh water to reach the censor during OWS operations. It is unclear from the government's designations whether McKay Marine determined or whether the government expects Mr. Dolan to testify that, after the cleaning, the censor accurately measured samples with positive quantities of oil. It is similarly unclear whether McKay Marine determined or the government expects Mr. Dolan to testify concerning how, before cleaning, the soiled lens affected the censor's accuracy when oil was present, although the designation states that Mr. Dolan will opine that dirty lens readings of 3-4 ppm oil during discharges "are instead representative of approximately "0" ppm and that the readings are "indicative of tricking the sensor with [apparently pure] fresh water; and consistent with the . . . metal insert."

The designation states that Mr. Dolan will opine that staining on JOANNA's OWS discharge piping "is indicative of hydrocarbons in excess of 15 ppm" and is "consistent with the use of the . . .metal insert."

The disclosure states Mr. Dolan "compared" the recorded electronic data from the OCM's memory for the dates of alleged exceptional discharges (November 10, 2020, January 23, 2021, and February 25, 2021) with the data from some discharges on "prior dates, including a recorded discharge on September 4, 2020" and that he will opine that some of those prior discharges "present as normal discharges."

Mr. Dolan is designated to testify that he designed a test to determine whether the metal chock allows or causes a sample that includes both untreated bilge water and fresh water to reach the OCM's optical sensor, that he believes while conducting the test such a diluted sample did reach the sensor, that a diluted sample "may" allow for more than 15ppm of oil to be discharged,

3

and that any level of dilution "resulted in discharges that violated MARPOL regardless of the concentration of oil present in the overboard discharge."

In short, Mr. Dolan appears designated to testify or imply, often based largely on speculation, that:

1. The OWS and OCM *did* cause the discharge of more than 15ppm of oil (based on the discharge piping stains);

2. The metal chock may have been present during some OWS operations, but not others;

3. The metal chock and certain recorded OCM data[1] are "consistent" with *pure* fresh water being introduced to the sensor; and

4. The metal chock and Mr. Dolan's testing are also "consistent" with a sample of OWS effluent reaching the OCM sensor with some unspecified dilution (but not replacement) by fresh water, and Mr. Dolan's legal opinion is that the extent of any dilution is irrelevant because any dilution was a high-seas violation of MARPOL.

The day after receiving the April 4 designation, the defense provided a video of testing performed in Athens by experts Gerasimos Aretos and Iannis Zoumis on a Deckma OCM of the same make and model showing that a metal plate slightly larger than the plate welded to the seized OCM did *not* cause dilution or prevent discharge sample from reaching the OCM's optical sensor. The government requested that the Deckma OCM be made available for its inspection. When the OCM was made available for inspection in Athens, Greece, the government insisted the OCM should be brought to New Orleans. That has been accomplished. Mr. Panagiotareas

---

[1] The designation is decidedly unclear but perhaps implies Mr. Dolan will testify that during some OWS operations the recorded OCM data shows more variability, that greater variability during OWS operations is typical, and that Mr. Dolan will speculate the difference is evidence of some impropriety.

travelled to Athens, confirmed the videotaped test results, and returned to the United States with the Deckma OCM. It is available to the government and the defense has authorized the government to inspect the OCM and conduct any private tests it desires so long as the government does not alter or destroy the machine.

      Defendants also promptly requested that Mr. Panagiotareas be allowed to inspect and test the seized JOANNA OCM. Inspection, but not testing, was allowed on April 18. On that day, Mr. Panagiotareas was told his inspection would be monitored and he could conduct only pre-approved, government-monitored tests. Defendant Tan then moved to conduct private testing of the seized OCM. Over the government's objection, on May 12, 2022, Judge Roby ordered the government to make the seized OCM available to the defense expert for private, unmonitored testing at the government's offices. (Document 184.) That testing was scheduled for and took place on May 27, 2022. At the time the government had set up a proposed jury demonstration of the OCM for trial scheduled to commence May 31, 2022. (The prior day, May 26, the Court granted the government's motion to continue because of a government attorney's illness.)

      Mr. Panagiotareas' testing was designed to help understand and evaluate the testing Mr. Dolan had conducted and the myriad inconsistent opinions to which government counsel represented Mr. Dolan would testify. Because the principal focus of the effort was to understand and rebut Mr. Dolan's opinions and tests – and because the results were consistent with Mr. Panagiotareas' prior opinions and designations -- the defense did not and does not believe a supplemental designation was required. Out of abundant caution, however, a supplemental disclosure was provided, explaining that Mr. Panagiotareas considered his testing consistent with the Athens testing of a duplicate OCM, that any dilution of the sample caused by the metal chock was minimal and that the ORB entries were accurate. Defense counsel disclosed that Mr.

5

Panagiotareas ran Mr. Dolan's so-called "bucket test" long enough to determine the maximum amount of water from the "fresh water" bucket could have contributed to the sample reaching the sensor. Counsel provided the government with the photographs attached as **EXHIBITS A AND B** taken by Chief Tan's local attorney depicting how much water left the government's "sample" (nearly all of it) and how much left the "fresh water" buckets (almost none of it) while Mr. Panagiotareas conducted the government's proposed in-court "bucket test" with the OCM valve in the chock-modified "operating" position. Mr. Panagiotareas did not measure the precise amount of water drained from each bucket (which he considered doing by refilling the buckets to their respective start lines with measured water), because so little had left the "fresh water" bucket and some of it leaked to the carpet through the government's valves.

## DISCUSSION

I. *Mr. Panagiotareas is not expected to testify on the topics numbered 4, 6 and 8 in the motion*

As explained during the final pretrial conference, Chief Tan does not expect to elicit opinion testimony as designated in paragraphs number 4, 6 and 8. Whether the topics may become relevant depends on what testimony Mr. Dolan provides and is allowed to provide. Chief Tan remains confused concerning what testing McKay Marine, the Coast Guard, or Mr. Dolan did to determine, among other things, the effect of the soiled lens before cleaning it, and as noted above, the designation for Mr. Dolan seems confusingly inconsistent. The defense also will not know in advance the government's cross-examination of Mr. Panagiotareas. Counsel, however, will advise the Court if the defense believes the topics have become relevant and important. As the Court observed at the conference, the matter can be addressed if necessary.

II. *Mr. Panagiotareas' disclosed mathematical calculation concerning the effect of dilution and his assessment of the practical affect of suspected limited dilution are appropriate, relevant, and helpful*

The government's Objection No. 5 is mistaken in all respects and is inconsistent with its designation of Mr. Dolan's designated (and speculative) testimony. As noted, the government apparently designated Mr. Dolan to testify that the OCM "may" have been tricked with pure fresh water, that it "may" have been tricked with a diluted sample, and that, based on staining of discharging piping, more than 15 ppm of oil may have been discharged at some unspecified time. The government also designated him to testify that irreversible changes the government or its consultant made to the OCM sensor caused him to conclude that the OCM may have overstated the oil content of some fluids reaching the OCM's sensor. As also noted above, it is unclear whether Mr. Dolan (or anyone) might testify (or conducted tests to determine) how the dirty lens affected the OCM sensor's measurements when oil was present in fluids reaching the sensor.

It appears, however, that the government has designated expert testimony from Mr. Dolan suggesting (a) that more than 15 ppm went overboard at some time, (b) that a modestly diluted sample may have reached the OCM sensor during Chief Tan's OWS operations, and (c) that the diluted sample was measured as having 4 ppm's of oil by a sensor that was accurate except that it consistently overstated the presence of oil by exactly that amount. That seemingly designated evidence necessarily raises the questions (1) whether alleged excess oil went overboard during those Chief Tan's OWS operations, (2) what was the actual oil content of the effluent without dilution, and (3) what would motivate such a dilution.

Some jurors may be comfortable with the mathematical proposition presented by question (2): If a diluted sample is measured as having 4 ppm oil by a sensor that overstates oil by 4 ppm then the diluted sample necessarily has (as Mr. Dolan seems poised to testify) zero ppm of oil; and if a diluted sample has zero ppm oil, the pre-dilution sample likewise had zero ppm oil, because of what is known as the "zero property of multiplication" (zero multiplied or

7

divided by any number is zero). Because other jurors may benefit from assistance and out of abundant caution, Mr. Panagiotareas, a highly educated and experienced marine engineer, is designated, among other things, to explain that mathematical truism.

At page 3, the government mistakenly asserts this mathematical truism, understood since Indian mathematician Pingala's work in the third century BC, is "wrong" and that "because of the defendant's misconduct the actual ppm is unknowable." Defense counsel respectfully asks the Court to caution government counsel to abandon the improper practice of asserting or implying they know Chief Tan is guilty. *E.g.*, *United States v. Warren*, 594 F.2d 1046, 1049 (5th Cir. 1979) ("prosecutor erred in expressing a personal opinion about credibility of the witnesses").

At pages 3 and 4, the government next argues that whether OWS effluent contained any oil is irrelevant and confusing (citing Rule 403) because any sample dilution "is itself a MARPOL violation," that Chief Tan made "affirmative entries asserting that discharges had been made through a properly functioning OCM" proving he was guilty of "the failure to maintain an accurate Oil Record Book" and that any evidence or argument about the effect of suspected dilution "could only be offered to confuse the jury."

On the contrary, the government's argument is both intended to confuse and would render most of the government's designated expert testimony (and its mountain of exhibits) irrelevant and confusing. Chief Tan is not capable of committing the crime of "failing to maintain an oil record book." The Fifth Circuit, of course, has squarely held: "Chief engineers on foreign-flagged vessels cannot, however, be prosecuted simply for having previously failed to maintain an oil record book once a ship enters U.S. waters, because 33 C.F.R. § 151.25 assigns that duty explicitly and exclusively to the 'master or other person having charge of the ship.'"

*United States v. Fafalios,* 817 F.3d 155, 162 (5th Cir. 2016). The Court has ruled that Chief Tan may be charged with "willfully causing" Captain Akkaya to commit that offense.

The government knows its obligation to prove knowledge and motive. In APPS cases the government typically attempts to prove willfulness (and motive) by presenting evidence the OWS could not adequately separate oil from water. To search for such evidence, the government returned to the vessel to open and inspect the three-stage OWS, which was near the end of its cycle between periodic cleanings. The evidence will show that, as would be expected, the first stages of the OWS had accumulated oil, but that the final stage was not oiled, that the OWS was in good condition, and that when a replacement OCM was installed, the OWS, without cleaning, operated well. In many cases, the government has run the OWS and captured effluent to determine its oil content, offering the results if excessive as evidence of motive. The government apparently chose not to do that routine testing of the JOANNA. The crewmembers working in the engine room testified that Chief Tan is highly conscientious, attentive to environmental rules and concerns, and has an excellent reputation for candor and honesty.

Faced with those difficulties in making out the elements of the offense, the government essentially argues that Count One charges Chief Tan with some strict liability high-seas violation of MARPOL, stating at page 7 that any dilution of the sample is "prohibited"[2] by MARPOL and

---

[2] The defense does not contend that intentionally diluting the OWS sample on the high seas for an improper purpose would be proper under Marshall Islands law. The evidence will show Chief Tan did no such thing. To avoid confusion, however, the defense notes the cited provisions in MARPOL's annexes calling for party states to require discharges with less than 15 ppm oil "without dilution" – and the corresponding provisions of Marshall Islands law – are obviously written and intended to prohibit dilution of the bilge water or OWS discharge itself. In other words, a Marshall Islands ship may not circumvent the requirement by pumping seawater into its bilge holding tank to intentionally dilute until the required oil content is reached. On the other hand, some dilution is inevitable, for example by heavy tropical condensation. Such unintentional and modest dilution is not a violation. Mr. Panagiotareas concluded the immaterial dilution the government's tests suggests would not be considered a violation under Marshall

9

that "whether defendant violated MARPOL a little or a lot is irrelevant." Again, the defense respectfully asks the Court to caution government counsel not to misrepresent the law or the charges. For several reasons, it could not be said that defendant Tan "violated MARPOL" – and in any event he is charged with no such crime. First, MARPOL "is not a self-executing treaty." *United States v. Pena,* 684 F.3d 1137, 1142 (11th Cir. 2012). Instead, each signatory agrees to "give effect" to it by establishing rules for ships that fly its flag, certifying compliance, and sanctioning those ships that are not in compliance. *Id.; United States v. Ionia Management S.A.,* 555 F.3d 303, 307 (2d Cir. 2009); *see* MARPOL arts. 1(1), 4(1), 5(1). Hence, a ship is not properly said to be in violation of MARPOL, but rather of the laws of a country implementing MARPOL; on the high seas, the ship can only be in violation of rules or laws established by its flag state to implement MARPOL, for the flag state is designated by MARPOL as the Administration for that ship and responsible to prescribe and impose high seas penalties. If, hypothetically, a ship engages in conduct on the high seas that is inconsistent with a MARPOL annex but conforms with the law of the flag state (because the flag state either is not a party to MARPOL, failed to fully implement it, or implemented a revised version[3]), that ship has not violated any law.

---

Islands law. Similarly – and the government has not contended otherwise – the dirty lens that affected the OCM's ability to measure oil content accurately was not a violation.

[3] The United States, for example, has not adopted several recent amendments to the MARPOL annexes; and U.S. regulations implementing APPS vary from the MARPOL annexes themselves. The MARPOL annexes include no provision requiring ships to "maintain" a record on an ongoing basis (although the annexes include provisions for flag states to require ships to retain the records) and no provision imposing any ongoing duty "to maintain" the record on the captain or on any other crewmember. U.S. regulations include those provisions because they were carried forward from regulations applicable only to U.S. ships implementing the Oil Pollution Act of 1961.

Second, MARPOL provides that ships, not crew members, may violate the annexes (or regulations) MARPOL signatories agree to adopt. For example, Article 4, paragraph (3) of the '73 Convention sets forth the process for port states and the flag state (i.e. the MARPOL Administration) to coordinate where the port state has information about a violation "by a ship."

Third, defendant Tan was a non-American employee of a vessel flying the flag of the Republic of the Marshall Islands. *If* the Marshall Islands had (or MARPOL recommended) a strict liability criminal offense related to high seas OWS operations or ORB entries (neither does), the violation would be only of the law of the Marshall Islands. Though the United States has implemented MARPOL through APPS, Chief Tan could not be prosecuted for any high-seas violation in the United States. *See Fafalios,* 817 F.2d at 162.

The government has charged Chief Tan with "willfully causing" the captain to commit a violation of U.S. law (not some technical violation of MARPOL). Its case that Chief Tan was aware of the chock and intended to use it to cheat is based entirely on speculation and supposed expert testimony, much of which is internally inconsistent and logically flawed. Mr. Panagiotareas' testimony is important and appropriate rebuttal.

III. *Mr. Panagiotareas' testing of another Deckma OCM of the same make and model as the seized OCM is fully and adequately disclosed and is relevant because of the confusing testimony designated by the government, because he considers it consistent with his testing of the seized OCM, and because the government has listed exhibits designed to show the model generally is susceptible to metal chock cheating*

Mr. Panagiotareas has tested both the seized OCM and another Deckma OCM of the same make and model. He concludes that a metal chock of the size present on the seized OCM does not cause material dilution in either unit.

The government contends that the behavior of any other Deckma OCM is irrelevant. Contrariwise, the government has listed as trial exhibits Coast Guard and other documents

11

asserting that the Deckma OCM is susceptible to metal-chock cheating. Especially if such documents are admitted into evidence (over hearsay and other objections), Mr. Panagiotareas' testing of another unit of the same make and model is important and obviously relevant evidence.

The government mistakenly suggests Mr. Panagiotareas' testing has not been adequately disclosed. Contrary to the government's assertions, it has had detailed expert designations *and a detailed video* of the testing since April. Citing only Federal Rule of Criminal Procedure 16(b)(a)(B)(ii) and (C) (sic), the government argues the evidence should be excluded because Mr. Panagiotareas did not author a report concerning the testing and has not provided "a reciprocal live demonstration" of his testing or other efforts. Rules 16(b)(1)(B) and (C) do not require expert reports. Instead, where the government has complied with a defendant's request for such discovery, Rule 16(b)(1)(B) requires the government be allowed to inspect and copy "the results or reports of . . . any scientific test or experiment if. . . the item is within the defendant's possession, custody, or control. . . *and* the defendant intends to use the item in the defendant's case-in-chief at trial, or intends to call the witness who prepared the report and the report relates to the witness's testimony." Rule 16(b)(1)(C) requires such reciprocal disclosure, by the defendant, of his expert's expected testimony. Neither requires the creation of reports that do not exist or live demonstrations of an expert's work.

Moreover, Mr. Dolan did not provide any demonstration of his work, nor did the government provide any demonstration as part of its Rule 16 discovery. One business day before trial was scheduled to commence, the government provided only a demonstration of its proposed in-court jury demonstration.

Discovery from defendants in criminal cases is relatively limited "due to 'constitutional' limitations that are thought to restrict prosecutorial pretrial discovery." *United States v.*

*Impastato,* 535 F. Supp. 2d 732, 742-43 (E. D. La. 2008), citing 2 Charles Alan Wright, et al., Federal Practice & Procedure Criminal § 255 (3d ed. 2007). *See also United States v. Dailey*, 155 F.R.D. 18, 21 (D.R.I. 1994) (holding that Federal Rules trumped local rules where local rule required automatic disclosure by both parties of evidence to be used at trial without any prior defendant request); *United States v. Layton*, 90 F.R.D. 520, 523 (N.D. Cal. 1981) ("[T]here is no authority for the proposition that a court has inherent authority to compel a defendant to provide pretrial discovery which is not specifically authorized in Rule 16.").

Defendant Tan has gone far beyond the requirements of Rule 16. Rather than merely making the Deckma OCM available for the government's inspection in Athens, he has brought it to New Orleans. Unlike the government, Chief Tan has allowed the government to take possession of that OCM and conduct any testing that does not alter the machine entirely unmonitored by the defense.

IV. *Mr. Panagiotareas' assessment of the practical effect of suspected limited dilution is appropriate, relevant, and helpful*

The government's Objection 10 is closely related to its objection Number 5 discussed above and should be rejected for all the reasons summarized in that discussion. In essence, the government contends that it may call Mr. Dolan to speculate concerning that various of his observations and investigations are "consistent with" various theoretical (but distinct) "MARPOL violations." For the reasons outline above, Mr. Panagiotareas' supplemental testimony is important rebuttal. In effect, the government has disclosed that it proposes to conduct a jury demonstration designed to show that some level of dilution "may" occur, but the government argues the defense should be prohibited from pointing out that the government's own test shows that any dilution is minimal and inconsistent with much of the government's speculations and contentions.

The government's motion makes clear that it presumes Chief Tan is guilty. The law presumes the opposite and affords Chief Tan the right to rebut the government's evidence and arguments.

**B. Gerasimos Aretos and Iannis Zoumis**

The defense has advised the government it does not intend to call these gentlemen unless Mr. Panagiotareas is unavailable to cover the designated topics. The government asserts the defense "must know" whether Mr. Panagiotareas will be available. On the other hand, the government seems to argue that the designation of Mr. Panagiotareas' testimony on these topics is somehow deficient (and of course government counsel himself proved unavailable for the May 31 trial). Unforeseen circumstances can render anyone, including Mr. Panagiotareas, unavailable at a given time. These other experts remain appropriately designated just in case.

## Conclusion

For each foregoing reason, the government's second motion to exclude expert testimony should be denied.

Dated this 24th day of October 2022.

        /s/ Caroline Gabriel
Caroline Gabriel, Bar No. 38224
William Most, Bar No. 36914
Most & Associates, L.L.C.
201 St. Charles Ave. Suite 114 #101
New Orleans, LA 70170
(504) 509-5023
caroline.gabriel.ma@gmail.com
williammost@gmail.com


/s/ Edward S. MacColl
Edward S. MacColl, MBRN #2658
Pro Hac Vice
Counsel for Defendant Tan

CERTIFICATE OF SERVICE

    I do hereby certify that on the above date I made service of the above document by electronically filing the same using the Court's EM/ECF system.

        /s/ Edward S. MacColl